UNITED STATES BANKRUPTCY COURT
FOR THE WESTERN DISTRICT OF MICHIGAN


IN RE:

JALAL PARIROKH,                                                  Case No. 11-05409
                                                                 Chapter 7
                Debtor,

_____/

COMMERCIAL PROPERTY                                              Adversary Pro. No. 11-80552
DEVELOPMENT COMPANY, LLC,

                Plaintiff,

v.


JALAL PARIROKH,

                Defendant.

_____/


OPINION AND ORDER

        PRESENT:    HONORABLE SCOTT W. DALES
                    United States Bankruptcy Judge



I.  INTRODUCTION

        The largest scheduled creditor of chapter 7 debtor Jalal Parirokh seeks an order barring

discharge of all debts on several grounds involving Mr. Parirokh's lack of candor or recklessness

in connection with his bankruptcy filings.  Because the creditor has proven its case under

11 U.S.C. § 727(a)(2) and (a)(4), the court will enter judgment barring discharge.  This Opinion

constitutes the court's findings of fact and conclusions of law pursuant to Fed. R. Civ. P. 52 and Fed. R. Bankr. P. 7052.

## II.  JURISDICTION

The court has jurisdiction over the bankruptcy case under 28 U.S.C. § 1334(a).  This adversary proceeding is a core proceeding under 28 U.S.C. § 157(b)(2)(J) because it involves an objection to discharge.  The United States District Court for the Western District of Michigan has referred the case and this adversary proceeding to the bankruptcy judges of the district pursuant to 28 U.S.C. § 157(a) and LCivR 83.2(a) (W.D. Mich.).

The parties have offered no authority indicating that the Supreme Court's opinion in *Stern v. Marshall*, 131 S. Ct. 2594 (2011), should be read in any way as limiting the court's power to enter final judgment regarding discharge, and the court is aware of none.  The court finds that it has authority to enter final judgment.

## III.  ANALYSIS

A.    Procedural History

On November 14, 2011, Commercial Property Development Company, LLC (the "Plaintiff") filed a Complaint Objecting to Discharge against Jalal Parirokh (the "Defendant") pursuant to § 727(a)(2)(A) (concealing property within one year before the day of filing with the intent to hinder, delay or defraud creditors); § 727(a)(4)(A) (knowing and fraudulently making a false oath or account); and § 727(a)(5) (failing to explain loss of assets or the deficiency of assets).  *See* Complaint at ¶¶ 19-36 (DN 1).

The Plaintiff asserts that the Defendant failed to disclose certain interests and transactions on his bankruptcy petition including:  (1) nine deeds that evidenced a transfer to his wife of his interest in various pieces of California real property, including six that were transferred within a

year of bankruptcy; (2) his interest in about $60,000.00 that he permitted to be transferred to his wife beginning more than one year before the petition and ending after his bankruptcy filing; and (3) the fact that he resided with his wife in a community property state and may have had an interest in some properties transferred by her to others. The Plaintiff also claims that the Defendant failed to explain his loss of approximately $882,000.00 he received from the Plaintiff as part of a sale-leaseback transaction, as well as the dissipation of profits from his business as shown on his 2009 and 2010 tax returns. The Plaintiff argues that the Defendant's fraudulent intent can be inferred from circumstantial evidence and the cumulative effect of his pattern of omission, relying principally on Judge Rhodes's opinion in *General Motors Company v. Heraud (In re Heraud),* 410 B.R. 569, 581 (Bankr. E.D. Mich. 2009).

The Defendant, on the other hand, argues that the Plaintiff has failed to prove that he knowingly and fraudulently made false statements, or that he had actual intent to hinder, delay or defraud his creditors, or failed to account for hundreds of thousands of dollars in cash proceeds received from the sale of various properties.

Both parties filed Motions for Summary Judgment on September 28, 2012 (DN 19 and 20). After a hearing, the court found genuine issues of material fact, and denied both motions in an order dated February 4, 2013 (DN 52).

On May 21, 2013, in Grand Rapids, Michigan, the court held a bench trial at which the Defendant testified. The parties stipulated to the admission of each other's exhibits and, at the close of proofs, the court permitted them to make closing arguments in writing, by filing briefs within 28 days after trial (DN 55). The parties submitted post-trial briefs, which the court has carefully reviewed.

B.      Historical Facts

The court makes the following findings.  In 2001, the Defendant formed Artemisia, LLC, a high-end French fashion store in the Grand Rapids area.  By the end of that year, it was so profitable that the Defendant was able to purchase the building in which Artemisia rented space, and the building next door.  To facilitate this purchase, the Defendant formed Liela, LLC ("Liela"), which, along with the Defendant, obtained loans through LaSalle Bank and Flagstar Bank.  Liela then leased retail space to Artemisia.  (Pl. Exh. 4, p. 57:4-60:4).

Liela entered into an agreement with the Plaintiff in 2004 to sell the two buildings to the Plaintiff, and lease them back.  (Def. Exh. 4).  As part of the transaction, the Plaintiff continued leasing the retail space to Artemisia.  The sale closed on June 28, 2004.  (Def. Exh. 5).  After expenses and fees, Leila netted $882,310.00 on the sale.  (*Id.*).

About this same time, the Defendant's brother suggested that they purchase some commercial property on 54th Street in Kentwood, Michigan (the "54th Street Property").  In order to facilitate this purchase, the Defendant and his brother formed Hulk Development, LLC ("Hulk").  (Pl. Exh. 38).  After the Defendant agreed to make a down payment of $50,000.00 and personally guarantee the $1,180,000.00 loan, National City Bank ("National City") agreed to finance the purchase.  (Def. Exhs. 8 and 9).  The sale closed on August 13, 2004, and National City recorded its mortgage.  (Def. Exh. 10).

Post-closing, a real estate broker named Jim Peterson approached the Defendant and his brother and assured them that he could secure Goodwill Industries ("Goodwill") as a tenant for the 54th Street Property.  (Pl. Exh. 4, p. 35:23-25).  However, the building on the 54th Street Property was in disrepair, and sometime before or during negotiations with Goodwill, Hulk arranged to demolish the building.  (Def. Exh. 11).  When the parties finally came to an

agreement three years later, in 2007, the deal included very specific requirements, including that Hulk construct a building to Goodwill's specifications. (Pl. Exh. 4, 24:14-15). During this three year period, Hulk derived no income from the 54th Street property. In addition, Hulk spent approximately $144,500.00 preparing the real property for construction by tearing down an existing building and constructing the infrastructure. (Pl. Exhs. 52 and 53).

According to the Defendant, business was starting to dwindle at Artemisia, which he attributed to a political backlash in the United States against French fashions -- Artemisia's niche -- in response to France's taking unpopular positions during the war in Iraq. By 2008, sales had declined so much that Artemisia was forced to liquidate its inventory and close the doors. This caused Liela to default on the lease with the Plaintiff (Pl. Exh. 4, p. 61:16-23), prompting the Plaintiff to sue Liela and the Defendant. The Plaintiff obtained a judgment against both for $384,892.49. (Pl. Exh. 9).

Between the failure of Artemisia, the purchase of the 54th Street Property with no profit for three years, and the eventual cost overruns of constructing Goodwill's building, the Defendant and Hulk were unable to complete the building project. The Defendant bought out his brother's interest (Def. Exh. 13) in Hulk by taking out another loan, this time with Byron City Bank (Pl. Exh. 4, 14:2-4) and approached National City again. National City approved Hulk for a twelve month carrying cost loan of $740,000.00 and a construction loan for $1,900,000.00. (Def. Exh. 14). National City cross-collateralized the loans and required another personal guarantee from the Defendant. (Def. Exh. 15).

After construction was completed, the commercial real estate broker sent Hulk an invoice for his commission in the amount of $85,000.00. Hulk (and the Defendant) disputed the value of the broker's services, but through the Defendant, eventually agreed to allow Grubb & Ellis, the

real estate broker's firm, to place a lien on the 54th Street Property. (Def. Exh. 16; Pl. Exh. 4, p. 36:10-15). The Defendant's real estate attorney also placed a lien against the 54th Street Property, presumably for his services in connection with the transaction. (Pl. Exh. 4, p. 45:21-46:3). Goodwill moved into the building in November 2007 and began paying Hulk $20,000.00 per month in rent. (*Id.*, p. 111:11-13).

In 2008, the Defendant married Iryna Averycheva ("Iryna"), who moved to the United States from the Ukraine to marry him. (Pl. Exh. 4, p.71:12-72:9). After they were married, the Defendant made Iryna a 50% shareholder in Hulk. (Def. Exh. 41; Pl. Exh. 4, p. 16:7-10).

Hulk's notes to National City came up for renewal in 2009. (Def. Exh. 17). National City's successor, PNC Bank ("PNC"), regarded the broker's and the attorney's liens filed against the 54th Street Property as defaults under the loan agreement. (Pl. Exh. 80, ¶ 9). Instead of foreclosing, however, PNC permitted Hulk to enter into a forbearance agreement which gave Hulk and the Defendant approximately eight months to sell or refinance the 54th Street Property. (Def. Exh. 17). At the bottom of the real estate market in 2009, this was not a simple undertaking, and the Defendant again turned for assistance to the same real estate broker he used to secure Goodwill as a tenant. This did not work either, and on October 21, 2009, when the forbearance agreement was about to expire, PNC refused to extend it and accelerated the loan, which by this time equaled approximately $2.5 million. *Id.*

Understanding the Defendant's and Hulk's dilemma, the real estate broker and his business partner offered to buy the PNC notes. (Pl. Exh. 4, p. 46:14-25). PNC was receptive to this offer and assigned Hulk's debts to the broker's company, Division Avenue Properties ("DAP"). (Def. Exh. 18). DAP immediately offered the Defendant and Hulk full satisfaction of the $2.5 million debt, and release of the other two liens on the 54th Street Property in exchange

for the deed to the 54th Street Property.  In effect, DAP proposed to accept a deed in lieu of foreclosure to release its claims.  (Def. Exh. 18).

The Defendant sought his attorney's advice -- the same attorney who had a lien on the 54th Street Property -- because the Defendant was fairly certain that the 54th Street Property was worth closer to $3.3 million.  (Pl. Exh. 4, p. 47:1-3).  The attorney advised him that if he did not accept the deed in lieu of foreclosure deal, DAP could foreclose, and presumably, if the 54th Street Property did not realize its full value at auction, the Defendant would be personally liable for the deficiency.  (Pl. Exh. 39:23-42:23).  With the Defendant's attorney and his broker asserting claims against him and liens against Hulk's property, he was in a very tenuous position.

Iryna, as 50% owner of Hulk, was vehemently opposed to the proposal because she would receive no benefit.  (Pl. Exh. 4, p. 47:13-22).  Consequently, DAP sweetened the deal and agreed to pay an additional $60,000.00.  (*Id.* p.47:4-12).  Everyone at the table eventually agreed to these terms and a deed in lieu of foreclosure was executed on January 2, 2010.  (Def. Exh. 18).  Not until after this entire transaction was closed did the Defendant allegedly discover that DAP was owned by the real estate broker, or that the broker may have been in cahoots with the attorney.  (Pl. Exh. 4, p. 41:12-17).  He contacted another attorney to investigate the possibility of pursuing a lawsuit against these two, but new counsel advised him that, in connection with the deed in lieu of foreclosure, he signed waivers that would likely preclude a successful legal action.  (Pl. Exh. 33).

Apparently, while the Defendant struggled with these issues, the Plaintiff was trying to collect on its judgment.  It scheduled at least one creditor's examination, which the Defendant did not attend.  After being evicted from their home and betrayed by the attorney and broker, the Defendant and Iryna packed up and moved to California (Trial Tr. p. 37:6-16), where they

resided, sometimes together, sometimes apart, as married persons. After the move, the Plaintiff hired a private detective, tracked down the Defendant, domesticated its judgment in California, and repossessed his Porsche at a residential property titled in his wife's name. (Trial Tr. p. 44:10-45:24, (DN 59)).

At the same time, the Defendant contends that with the help of her friends, business partners, and her parents' money from the Ukraine, Iryna began flipping properties in California, purchasing and fixing up residential real estate. (Pl. Exh. 4, p. 75:4-23). He claims that he only helped repair some of the properties, but that the properties never belonged to him and were always titled in Iryna's name or jointly between her and her business partners. Despite this pretense, the Defendant executed nine deeds between December 2009 and October 2010, in favor of his wife or various purchasers. (Pl. Exh. 10-19). At her deposition, however, Iryna could recall very few details regarding the transactions, and could not testify about how much money her parents gave her before she arrived in the United States, where she kept the money when she arrived here, or who the other supposed real estate investors were, except to say they were friends of friends. (Pl. Exh. 7).

Within a year of going to California, the Defendant and Iryna separated and he moved back to Michigan. On May 12, 2011, he filed a voluntary bankruptcy petition under chapter 7. He has since moved to Atlanta, Georgia, where he now resides with his mother, brother and his brother's girlfriend. (Pl. Exh. 4, p.77:4, 98:7-8).

The Defendant does not dispute that in his bankruptcy schedules he failed to disclose the transfers of the California properties or the deed in lieu of foreclosure, and in his Statement of Financial Affairs ("SOFA") he indicated that he had not transferred any property within the two years preceding the commencement of his case. Likewise, he did not disclose these transfers at

his § 341 Meeting. Similarly, his SOFA does not reflect that he resided with his wife in California, a community property state.

C.      Section 727(a)(5):  Failure to Explain Loss of Assets

The court must deny a discharge when the debtor has failed to satisfactorily explain any loss or deficiency in assets to meet his liabilities. Although the Plaintiff has the initial burden of proof to establish the objection, the burden of going forward with the evidence that will satisfactorily explain the losses or deficiencies shifts to the debtor. *Farouki v. Emirates Bank International Ltd.*, 14 F.3d 244 (4th Cir. 1994). The court finds that the Plaintiff has failed to meet its burden in establishing its objection under § 727(a)(5), for reasons that are patent in the record in addition to those asserted by the Defendant.

The Defendant's alleged dissipation of the approximately $882,000.00 paid by the Plaintiff in the sale-leaseback transaction which occurred in 2004, seven years before he filed bankruptcy, is remote in time from the petition. At trial, however, despite this passage of time, the Defendant showed that the bulk of the sale proceeds ended up in Hulk to capitalize that company. Similarly, his financial difficulties, and expenses endured and incurred by Hulk, reasonably explained the dissipation of the sale proceeds which, the court notes, belonged in the first instance to Liela, not the Defendant. The Defendant's explanation, which the court accepts, includes the following:  (1) the burden of owning the 54th Street Property for approximately three years without income to cover real property taxes and holding expenses; (2) a real estate broker's lien; (3) an attorney's lien; (4) disrepair of the improvements at the 54th Street Property, leading ultimately to demolition; and (5) expenses related to improving access (a road) to Hulk's property, and constructing a building for a tenant-in-waiting, Goodwill. Although not in the form of an accounting for every last penny, the Defendant's documents and testimony, especially

given the passage of time since his receipt of the sale proceeds indirectly through Liela, preclude a finding for Plaintiff with respect to the sale proceeds.

In addition, although the Plaintiff continuously asserted that the Defendant sold the Plaintiff the property that was the subject of the lease-back transaction (and received the benefit from this transaction), the record strongly suggests that Liela received the sale proceeds. Liela is not a debtor, and under state corporate law is distinct from its members, including the Defendant. Moreover, it is a basic tenet of Michigan limited liability company law that members, even sole members, have no interest in specific limited liability company property. *See* M.C.L. § 450.4504(2). If the sale proceeds never belonged to the Defendant, the court struggles to understand how it could punish him for failing to account for every dollar under § 727(a)(5). Likewise, if in fact there were profits from either Hulk or Artemisia, those profits belonged to the LLCs, not the Defendant. In short, the Plaintiff did not prove its case under § 727(a)(5) by a preponderance of the evidence.

D.      Section 727(a)(2)(A) and (a)(4)(A):  Concealment and False Oath

In order for a court to deny a debtor a discharge under § 727(a)(2)(A), the court must find by a preponderance of evidence that the debtor transferred, removed, destroyed, mutilated or concealed or permitted the transfer, removal, destruction, mutilation or concealment of his property within one year before the date of his petition. Section 727(a)(4)(A), like § 727(a)(2), addresses concealment of a different sort: a debtor's concealment of the truth by making a false oath in connection with his case.

In order to succeed under either subsection, the Plaintiff has the burden of proving fraudulent intent. Although actual intent must be shown under § 727(a)(2)(A), some courts have held that a finding of actual intent may be based upon circumstantial evidence or on inferences

drawn from a course of conduct.  *General Motors Corp. v. Heraud (In re Heraud),* 410 B.R. 569, 581 (Bankr. E.D. Mich. 2009).  Although a debtor's false statement resulting from ignorance or mere carelessness is not one that is "knowingly and fraudulently" made under § 727(a)(4),[1] a reckless disregard of the serious nature of the information sought and the necessary attention to detail required by the bankruptcy schedules and statement of financial affairs can establish the requisite intent.  *Jordan v. Bren (In re Bren)*, 303 B.R. 610 (8th Cir. BAP 2004).

To start, the Plaintiff claims that the Defendant concealed $60,000.00 of his property that was transferred to Iryna, directly or indirectly from DAP, as part of the Hulk transaction involving Goodwill and the 54th Street Property.  However, the Defendant and Iryna both claim that the $60,000.00 was in the form of a $50,000.00 transfer to her by DAP for her interest in Hulk as part of the transaction involving a deed in lieu of foreclosure, and the balance was paid over time into her bank account.  (Pl. Exh. 7, 83:8-86:3).  Based on her bank statements, it would appear that these payments occurred from approximately March 23, 2010 to August 3, 2010 and that the bank account was solely in her name.  (Def. Exh. 42).  From the documentary evidence and corroborating testimony of both the Defendant and his wife, it is more likely than not that the funds Iryna received from the Hulk deed in lieu transactions were paid to her from DAP because of her membership interest, to induce her to consent to the transaction.  Although prudence and caution might have counseled in favor of a more complete disclosure, the Defendant's failure to disclose his wife's receipt of these funds on account of her membership interest does not jeopardize his discharge.

---

[1] *Cadle Co. v. Pratt (In re Pratt)*, 411 F.3d 561 (5th Cir. 2005) (failure to disclose bank account with no balance not shown to be due to fraudulent intent).

The court, however, makes an altogether different finding regarding the transfer of the California properties.  In the Defendant's tax returns for 2005 through 2009,[2] he described his occupation as "Retailer," but after moving to California in late 2009, the 2010 IRS Form 1040 tax return, filed jointly with Iryna, describes his occupation as "Developer/Renovator," rather than "Retailer" -- a change that coincided with his wife's supposed acquisition of real estate in California.  Schedule C to the 2010 IRS Form 1040 (Def. Exh. 82) clearly identifies the Defendant, rather than his wife, as the developer with respect to the Adam Lane, Canyon Hills, Golden Pebble and Alhambia residences.  Some of the deeds for these properties describe Iryna's interest as "sole and separate," but others do not -- a fact that bears on whether the Defendant also had an interest in the properties under California's community property laws.

The court rejects as implausible the suggestion that Iryna used money that she obtained from her parents in the Ukraine to purchase the California properties, based largely on her deposition testimony.  Although she stated that she received funds from her parents before she moved to the United States sometime in 2008, and that she brought the money with her on the plane in cash, she could not recall whether she brought more than $100 or $1 million.  (Iryna Tr. at 50-52.)  It is conceivable that she used some of the funds from the Hulk transaction, but that was not her testimony, and her nearly complete lack of recollection about the real estate transactions and her own finances does not permit the court to infer that she used these funds. From the vagueness of her deposition testimony, pocked with memory lapses and devoid of detail, the court infers that her involvement in the real estate transactions was insubstantial.

At trial, the Defendant attempted, without success, to minimize his involvement in his wife's alleged California real estate flipping adventures.  His trial testimony frequently contradicted his prior deposition testimony, further undermining his credibility.  Given his wife's

---

[2] *See* Def. Exhs. 61-63 and 65.

incomplete recollection of most of the details of the real estate activity, the Defendant's knowledge of the California properties was superior to hers, tending to show that he was more involved than she was in the real estate business. This makes it more likely that he had an interest in the properties, just as his tax returns for the period suggest. His involvement in the process described during his deposition testimony, though minimized at trial, suggests that he and Iryna were not always estranged while living in California. Moreover, the fact that he executed nine deeds in his wife's favor, though allegedly at the suggestion of an unnamed title company agent, is also evidence of his ownership interest in the properties. Given the court's conclusion (discussed below) that the Defendant resided with his wife in California, his trustee and his creditors were entitled to the voluntary disclosure of this material information about the transfers.

Even if the Defendant truly believed that the California properties did not belong to him, the court finds that leaving them off his bankruptcy schedules amounted to a reckless disregard for the truth. Question 10(a) in his Statement of Financial Affairs ("SOFA") requires identification of transfers of property within the two years preceding the commencement of the case. In response to this central question, the Defendant checked the box "none" even though Plaintiff's Exhibits 10-18 show transfers of property, or at a minimum, a property interest, by him. Additionally, in the parties' Stipulated Facts (DN 57, p. 6-8), the Defendant admitted that within fifteen months of his bankruptcy filing, he executed nine Interspousal Transfer Grant Deeds wherein he granted his interest in the various California Properties to his wife. Although the Defendant testified that his understanding was that these transfers were only a technicality required by a community property state and that in fact he had no interest to grant, his 2010 tax return belies this assertion. He offered no testimony (other than his own) or documentary

evidence suggesting any communication from the title company to corroborate his explanation for the inter-spousal transfers.

The table of the California Properties admitted on stipulation (the "Table") enumerates some of the same properties claimed by the Defendant in Schedule C to IRS Form 1040 (the Profit or Loss From Business).   This tax schedule lists only the Defendant as a Developer/Renovator, not his wife.  Indeed, in her deposition, Iryna testified that she never spoke to the tax professional who prepared the couple's 2010 return, permitting the court to infer that the Defendant supplied this information to the tax preparer, closer in time to the events described.  In that tax return, the Defendant claims to have derived "profit or loss" from the four properties as part of his Developer/Renovator business -- the Alhambia Residence, the Canyon Hills Residence, the Golden Pebble Residence and the Adam Lane Residence.  This clearly suggests that he had an interest in the properties, despite the manner in which they were titled. And, on the Table, he claims to have transferred the Alhambia Residence to his wife on April 13, 2010; the Canyon Hills Residence on March 10, 2010; the Golden Pebble Residence on February 8, 2010; and the Lane Residence on May 28, 2010.  Crediting the information contained within the Table and on his 2010 tax return, the court finds that the Defendant transferred his interests in these properties within two years of his bankruptcy filing, and that he should have identified the transfers in response to Question 10 on his SOFA.  The evidence preponderates in favor of finding that the Defendant purposely concealed the transfers of the California Properties and that his discharge should be denied pursuant to § 727(a)(2).

Similarly, the Defendant omitted important information in response to Question 16 of his SOFA.  At trial, he insisted that he never established residency in California and therefore left the information about California off his bankruptcy schedules.   The omission, of course,

concealed possible claims to property titled in Iryna's name.  However, Question 16 on the SOFA is quite clear.  It reads:

> If the debtor resides or resided in a community property state, commonwealth, or territory (including Alaska, Arizona, California, Idaho, Louisiana, Nevada, New Mexico, Puerto Rico, Texas, Washington, or Wisconsin) within eight years immediately preceding the commencement of the case, identify the name of the debtor's spouse and of any former spouse who resides or resided with the debtor in the community property state.

The court finds that the evidence also preponderates in favor of finding that the Defendant resided in California with his wife within eight years of filing his petition.  First, he and his wife suffered the loss of the marital home in Michigan through foreclosure, which prompted them both to pack up his car and move to California, together, in late 2009.  They stayed at an extended stay hotel, and eventually Iryna took title in her name to a residence at 29048 Golden Pebble, Menifee, California -- the address where the Plaintiff eventually repossessed the Defendant's car.

The court does not doubt that the couple experienced marital difficulties and that from time to time may have lived under separate roofs in California during episodes of estrangement, but he did admit spending nights with her at 29048 Golden Pebble.  (Trial Tr. 45:19-21).  The court notes, too, that based on the Defendant's testimony, the couple's joint 2010 IRS Form 1040, and inferences drawn from Iryna's utter inability to recall the circumstances surrounding her supposed real estate activities in California, that the Defendant collaborated with his wife in purchasing and rehabilitating real estate or "flipping" houses in California.  The joint efforts suggest continued marital affinity and dependence while in California, and together with other data (including the location of the Defendant's vehicle at the time of levy), suggest that they resided together in California.  He reluctantly admitted at trial that he accompanied Iryna on her

business meetings and property inspections out of concern for her safety, making the obvious point that then, as now, "she was my wife." (Trial Tr. at 65:8-10). In 2010, while in California, they filed joint returns, and they remain married to this day. The fact that the Defendant's cell phone bill reflects an extended-stay hotel as his residence is not dispositive, and is equally consistent with behavior designed to keep creditors at bay.

It would take no special legal training for the Defendant to understand that "none" was not a truthful response to Question 16 of the SOFA.

In addition, at trial, the Defendant admitted that he read Question 16 on the SOFA for the first time that day. (Trial Tr. 137:12-19; 138:14-15). When asked about his 2010 tax documents in which he identified himself as the renovator or developer of several of the properties allegedly owned by his wife solely, he again distanced himself from the documents, blaming the professional preparer and underplaying his own role in filing them. The Defendant's more-than-cavalier attitude toward reading and reviewing legal documents that he has signed throughout his business career gives the court pause, and supports a finding of recklessness in connection with his bankruptcy-related documents. During the trial, his testimony showed a pattern of hiring professionals, turning a blind eye to the documents they drafted and asked him to sign, and then his disavowing statements that he attested to within those documents. At trial, in addition to Question 16 of the SOFA, the Defendant admitted that he did not read, review and/or remember the contents of his companies' operating agreement (Trial Tr. p. 18:11-15; p. 19:21-22); his tax returns (Trial Tr. p. 87:11-22); his personal guarantees (Trial Tr. p. 105:11-21); his consent to the broker's lien on the 54th Street Property (Trial Tr. p. 161: 2-24); and most relevant and detrimental here, his bankruptcy schedules (Trial Tr. p. 88:15-17; p. 137:12-19; p. 138:5-19; p. 141:9-143:20; p. 146:8-22). This willful blindness has tripped him up time and time again,

including, as it turns out, in this proceeding.  The material omission in response to Question 16 of the SOFA is but one example of the Defendant's reckless disregard of the serious nature of the information sought, and the necessary attention to detail required, by the bankruptcy schedules and SOFA that establishes his fraudulent intent in connection with the false statements described herein.  Accordingly, the court finds that the Defendant's discharge should be denied pursuant to § 727(a)(4).

## IV.  CONCLUSION

Although the Defendant did not formally account for every penny that he and his company received in the sale/leaseback transaction, due to the remoteness in time to his bankruptcy filing and his subsequent business transactions, the court finds that the Defendant sufficiently accounted.  The Plaintiff may not like where the Defendant spent the proceeds of the sale/leaseback transaction, but the concerns addressed in § 727(a)(5) are less about a debtor's choices or excuses, and more about the explanation.  In the court's experience, many debtors make poor choices.  The Plaintiff did not meet its burden under § 727(a)(5).

Because the Defendant fraudulently concealed the transfers of the California Properties on his bankruptcy schedules, however, the court will deny him a discharge under § 727(a)(2)(A). In addition, because the Defendant fraudulently omitted from the SOFA the fact that he resided with his wife in a community property state, § 727(a)(4) supplies another reason to deny him relief.   The court, therefore, will prepare a separate judgment denying discharge under § 727(a)(2) and (a)(4).

NOW, THEREFORE, IT IS HEREBY ORDERED that the Clerk shall prepare and enter a separate judgment consistent with this Opinion.

IT IS FURTHER ORDERED that the Clerk shall serve a copy of this Opinion and Order pursuant to Fed. R. Bankr. P. 9022 and LBR 5005-4 upon Daniel W. Linna, Jr., Esq., Christopher E. Tracy, Esq., Steven M. Bylenga, Esq., and Robert E. Lee Wright, Esq.

[END OF ORDER]

**IT IS SO ORDERED.**

**Dated August 5, 2013**



Scott W. Dales
United States Bankruptcy Judge